UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BEACH TV PROPERTIES, INC.,

        Plaintiff,

    vs.                                 CASE NO:  3:06cv241-RV-MD

BELLSOUTH MOBILITY, LLC
d/b/a CINGULAR WIRELESS, and
NEW CINGULAR WIRELESS PCS, LLC

        Defendant.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant New Cingular Wireless PCS, LLC as survivor by merger with BellSouth Mobility, LLC (hereinafter referred to as "Cingular"), moves for summary judgment on all four counts of Beach TV Properties, Inc.'s (hereinafter, referred to as "Beach") First Amended Complaint.  As set forth herein, there are no genuine issues of material fact and Cingular is entitled to judgment as a matter of law.

## BACKGROUND

Beach owns a 180 foot communications tower in Destin, Florida.  *First Am. Compl.* ¶ 9.  This tower was constructed in 1997 on land that Beach had leased from Destin Development Corporation.  *Deposition of Jud Colley* 4:11-13; 5:11-15.[1]  The initial term of that lease was ten

---

[1] Jud Colley is Beach's president and he was its designated representative at a May 17, 2007 deposition.  A transcript of that deposition is Exhibit Eight in the Appendix which accompanies this motion.

(10) years, with one ten (10) year option period.  *Colley Dep.* 17:19-25, 18:1-8.  Assuming that Beach exercises its option to renew, its lease will expire in 2017.[2]

Beach entered into that 1997 lease to obtain a site for a tower upon which Beach's affiliate, Beach TV, Inc ("Beach TV") could then locate its transmission antennas.  Once that had occurred, Beach then sought and obtained the consent of Destin Development Corporation to allow Beach to let space on the tower for cellular telephone companies to install antennas. *Colley Dep.* 16:19-25, 17:1-6.  Several cellular companies have installed antennas on the tower. *Colley Dep.* 22:9-25.

In May 2003, Beach entered into a lease with Cingular (hereinafter referred to as the "lease agreement").[3]  *First Am. Compl.* ¶ 10.  The initial term of the lease agreement was five (5) years commencing on June 15, 2003.  The lease agreement is Exhibit One in the Appendix accompanying this motion.  The yearly rent during the initial five year term was thirty thousand dollars ($30,000), to be paid annually in advance.  *First Am. Compl.* ¶ 12.  The lease agreement also provided for four additional five-year option periods.  However, Cingular could decline to extend the term of its lease by providing notice to Beach at least 6 months prior to the end of the then current lease term.  *Ex. One, Art. 3.*

Thus, Beach purported to grant Cingular a lease that ran through 2008, even though Beach's own lease was to expire in 2007, unless Beach extended that term with its own landlord.  Beach also purported to grant Cingular the right to extend the lease through 2028, even though

---

[2] At his deposition on May 17, 2007, Jud Colley, President of Beach, explained that in connection with the resolution of other disputes with Destin Development Corporation, Beach would be receiving an additional five (5) year extension but that this change had just occurred and had not yet been documented.  *Colley Dep. 18:9-24.*

[3] There is no Exhibit A to this lease agreement.  *Colley Dep. 7:14-20* ("(Exhibit A to the lease was) never produced").

Beach's own lease with Destin Development Corporation was certain to expire no later than 2017. *Colley Dep. 18:25 -19:1-3.*

By about August 2003, Cingular had installed six (6) antennas on the tower. *First Am. Compl.* ¶ 13. Also the ground-based equipment accompanying those six antennas was placed into an equipment shelter installed by Cingular. *Id.* ¶ 15. Beach takes no issue with the installation of the six antennas or the location of the equipment shelter. *Colley Dep.* 28:15-25, 29:1-7. By agreement, because of space constraints at the site, Beach TV's own ground-based equipment was relocated into a shelter that was located on an elevated platform which was constructed directly above Cingular's equipment shelter.[4] *Colley Dep.* 28:19-22; 29:1-7; 33:16-19. *Harris Dep. 13:10-22.*[5]

In May or June 2004, three more Cingular antennas were added to the tower as part of a nationwide technology upgrade, know as the GSM project. *First Am. Compl.* ¶ 14. To accommodate the ground-based equipment that serviced those three extra antennas, an addition to the already existing elevated platform was constructed.[6] Cingular does not dispute that one "footer" supporting this extension to the elevated platform was located to the outside of a security fence that had been erected at the tower site.[7]

Beach asserts that Cingular breached the lease agreement by adding the three antennas and by constructing the additional section of elevated platform. *First Am. Compl.* ¶ 20. Although its expert had not performed a structural analysis of the tower after the installation of

---

[4] A copy of an October 2005 photograph showing the Cingular equipment shed with the Beach equipment above it is attached as Exhibit Two in the Appendix.

[5] Kevin Harris was designated by Cingular as one of its deposition representatives. A copy of Kevin Harris' deposition is Exhibit Nine in the Appendix.

[6] As already noted, the existing elevated platform housed Beach TV's equipment and was located above Cingular's equipment shelter.

[7] It remains a point of contention between the parties as to whether the fenced area is the same as the leased area in the Beach-Destin Development lease.

the three extra Cingular antennas Beach also asserted (in March 2005) that its tower was structurally inadequate to permit the addition of those antennas without violating the City of Destin's wind-load restrictions.  *Id.* ¶ 17; *Colley Dep.* 41:15-23.

Cingular paid and Beach accepted the annual rent payment due in May 2005.  Thus, with knowledge of most of the matters about which it now complains,[8] Beach accepted Cingular's 2005 rent payment.  *See Colley Dep.* 49:18-24.

On May 23, 2005, Beach sent notice that if Cingular did not cure the alleged defaults within 60 days then the lease agreement would terminate.[9]  *Id.* ¶ 20.  Cingular did not cure the alleged defaults within the 60 days.  *Id.* ¶ 21.  Thereafter, in a September 8, 2005 demand letter,[10] Beach gave Cingular until November 23, 2005 to vacate the site.  *Id.* ¶ 23.  That letter reiterated that the lease agreement was <u>terminated</u> as of August 23, 2005.  *Id.*  By late November 2005 Cingular removed all nine of its antennas from the tower, as well as all of its ground based equipment servicing those antennas.  *Colley Dep.* 42:18-25, 43:1-10.  *Henderson Dep. 48:16.* [11]

Beach's September 8, 2005 letter stated that if Cingular's equipment was not removed by November 23, 2005, then Beach would consider the equipment abandoned or Beach would remove the equipment at Cingular's expense.  *Ex. Four.*  Cingular has not removed either the equipment shelter installed in 2003 or the addition to the elevated platform constructed in 2004.  *First Am. Compl.* ¶ 25.   On December 6, 2005, Beach delivered a further notice to Cingular repeating that the lease agreement had been terminated as of August 23, 2005 and advising that Beach would regard the remaining equipment "as abandoned" and "dispose of it as (Beach), in

---

[8] All matters save for the fact that Cingular left the original equipment shelter and the addition to the elevated platform when it vacated the site.

[9] A copy of this notice is Exhibit Three in the Appendix.

[10] A copy of this notice is Exhibit Four in the Appendix.

[11] A copy of the transcript of the deposition of Lisa Henderson is Exhibit Ten in the Appendix.

its sole discretion, deems fit."[12]  To this date, however, Beach has not removed either the empty equipment shelter or the addition to the elevated platform.  *Colley Dep.* 46:23-25, 47:1-8, 48:14-21.

In a subsequent December 7, 2005 letter, Beach reiterated the termination of the lease, and warned Cingular that any Cingular representative entering the premises without prior written consent would be "arrested for trespass."[13]  Cingular has not entered the premises since November 2005 and makes no continuing claim of any ownership rights to the equipment shelter or the elevated platform.  Consistent with Cingular's course of conduct, Beach acknowledges that Cingular currently is not in "possession" of the site.  *Colley Dep.* 54:17-21.

Cingular has provided written notice to Beach that Cingular does not intend to exercise any options to extend its lease.[14]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court that there are no genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *Samples v. City of Atlanta*, 846 F.2d 1328,

---

[12] A copy of this notice is Exhibit Five in the Appendix.
[13] A copy of this notice is Exhibit Six in the Appendix.
[14] A copy of this notice is Exhibit Seven in the Appendix.

1330 (11th Cir. 1988).  Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir.1988) (per curiam).

A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## ARGUMENT

For the sake of argument and for the purposes of this motion only, Cingular assumes that a breach of the lease did occur in 2004 with the installation of the three extra antennas and the construction of an addition to the existing elevated platform.   But even assuming that such breach did occur, Cingular is still entitled to judgment as a matter of law with respect to each of Beach's claims, because Beach has "terminated" the lease, because Beach has suffered no damages and because Cingular is not in possession of the site.

Beach's First Amended Complaint (Doc. 10) asserts four causes of action against Cingular.   Count I is for eviction.   Count II is for unlawful detainer.   Count III is for damages for the rent payable under the lease from 2006 through 2028.   Count IV seeks damages for waste.   Cingular will first address the two damage claims.

### I.      Count III
### (Damage claim for future rent)

Here, Beach asserts a claim for damages against Cingular for <u>future</u> rent for the periods from June 2006 to June 2028.   Cingular was current on its rent when Cingular removed its

equipment from the tower site in November 2005.[15]  In fact, Cingular's next rent payment was

not due until June 2006.   What is abundantly clear as matter of law is that Cingular has no

further obligation to pay any future rents because Beach affirmatively choose to <u>terminate</u> the

lease in 2005.   Also, out of abundance of caution and to minimize any possible claim, Cingular

has notified Beach that the lease will not be renewed for any of the option periods from 2008

onwards. *Ex. Seven*.  Furthermore, the demand for accelerated rent must fail because Florida law

precludes any such when the lease does not include an acceleration provision.

      A.    <u>Beach Is Not Entitled to Future Rents.</u>

     If Cingular had in fact breached the lease agreement in 2004, Florida law provided Beach

with three alternative courses of action:  (1) Beach could treat the lease as terminated and retake

possession for its own account, thus terminating any future liability on the part of the Cingular;

or (2) Beach could retake possession of the premises for the account of Cingular, holding

Cingular liable for the difference between rent stipulated to be paid under the lease agreement

and what, in good faith, Beach was able to recover from a reletting; or (3) Beach could stand by

and do nothing, holding Cingular liable for the rent due as it matured, which could mean all

remaining rent due if there was an acceleration clause and Beach chose to exercise the right to

accelerate.   *Wagner v. Rice,* 97 So 2d 267, 270 (Fla. 1957); *Coast Federal Savings and Loan

Assoc. v. Deloach*, 362 So. 2d 982, 984 (Fla. 2d DCA 1978); *Grove Restaurant and Bar, Inc. v.

Razook*, 571 So. 2d 596, 597 (Fla. 2d DCA 1990).  Florida courts have held that either of the first

two choices excludes the third.  *Razook* and *DeLoach*.

     Beach takes the position that it is entitled to accelerate future rents through 2028.  Beach

contends that Cingular owes damages in the amount of the rents due for the remainder of the

---

[15]  See Beach's Response to Request for Admissions, No. 4 (Rent for June 2005 to June 2006 was
paid on May 31, 2005).   A copy of this response is Exhibit Twelve in the Appendix.

current lease term (through 2008) as well as the four additional five-year options to renew the lease.  Beach's contention is wrong and it is entitled to no accelerated future rents because the lease agreement was terminated and because the lease agreement did not provide for the acceleration of rent upon Cingular's breach of the lease.

It is well-settled under Florida law that "future rent is demandable only in the amounts and at the time specified in the lease."  *Williams v. Aeroland Oil Co.*, 20 So. 2d 346, 348 (1944); *National Advertising Co. v. Main Street Shopping Center*, 539 So. 2d 594 (Fla. 2d DCA 1989) (same).  Thus, where a "lease contains no stipulation providing for the acceleration of future rents in the event of breach or default on the part of the lessee," the lessor is not entitled to seek a lump sum of rent "in advance of the accrual of the installments."  *Aeroland Oil Co.*, 20 So. 2d at 348.   Nothing in the lease agreement between Beach and Cingular provides for the acceleration of future rents in the event of Cingular's breach or default.    Thus, under no circumstances could Beach be entitled to recover rent which is not yet due.

> B.     Beach Terminated the Lease and is not Entitled to Any Future Rents.

Beach is not entitled to recover <u>any</u> further rent, accelerated or otherwise, because it terminated the lease.  The September 8, 2005 letter sent to Cingular on behalf of Beach TV explicitly and unequivocally states Beach's intention to terminate the lease agreement:

> Please be advised that the Tower Lease Agreement has been terminated as of August 23, 2005 due to Cingular's failure to cure its breaches of the Tower Lease Agreement as described in my letter to you dated May 23, 2005. *Ex. Four.*

Beach's intention to retake possession to the exclusion of Cingular was further emphasized by Beach's subsequent letter advising that any Cingular representative who entered the premises without permission would be arrested for trespass. *Exhibit Six*; *Colley Dep.* 49:5-8.  As a matter

of law, Beach's termination of the lease left [Beach] "with the one remedy to retake possession of the premises for its own account." *In re Pavco Enters., Inc.*, 172 B.R. 114, 117 (M.D. Fla. 1994); *Wagner v. Rice*, 97 So.2d 267, 270 (Fla. 1957) (where it is obvious that lessor intended to terminate lease, lessor cannot recover damages the rental that would have come due following lessor's resumption of possession of the premises); *Deringer v. Pappas*, 164 So. 2d 569, 571 (Fla. 3d DCA 1964) (same).

The fact that Beach subsequently attempted to relet the leased property does not change this analysis because seeking to find a new tenant is perfectly consistent with the actions of a landlord who has terminated a lease. What is important here is that in addition to attempting to relet, Beach also affirmatively "terminated" the lease, a state of affairs which is utterly inconsistent with the notion of taking back possession of the premises for the tenant's account.[16] Pursuant to the relevant case law, Beach could elect either to terminate the lease and retake possession of the leased property for its own account or elect *not to terminate* the lease but instead to treat the lease as continuing and to retake possession of the property on Cingular's account for the purpose of reletting the property and crediting Cingular for the rental subsequently obtained. Here, Beach clearly elected to terminate the lease which automatically means that Cingular's liability for future rent payments also was extinguished.

Hence, this case is factually distinguishable from cases in which a landlord elected not to terminate a breached lease, but rather, explicitly informed the defaulting lessee that it was

---

[16] In the different factual scenario when the tenant simply abandons the premises, the Florida Supreme Court has stated that "a surrender by operation of law" (which is the equivalent of a retaking for the landlord's own account and terminating the lease) depends upon "whether the possession taken by (landlord) is of an exclusive character, with the apparent intention of occupying and controlling the premises as his own, *to the exclusion of the tenant*, in case the latter desires to return . . ." (Emphasis added). *Kanter v. Safran*, 68 So 2d 553 (Fla. 1953). Here, there is can be no doubt as to Beach's intent to exclude Cingular from the site after December 2005, for any return would have been under threat of arrest for trespass.

electing to relet the premises for the account of the lessee.  *See, e.g., Vareka Invests., N.V. v. Am. Invest. Props., Inc.*, 724 F.2d 907, 912 (11th Cir. 1984) (parties were in agreement that lease had not been terminated and lessor re-entered the property to manage and operate it for the account of lessee, pursuant to terms of lease); *Jimmy Hall's Morningside, Inc. v. Blackburn & Peck Enterprises, Inc.*, 235 So. 2d 344, 345 (Fla. 2d DCA 1970) (lessor's letter to lessee indicated it was retaking possession of the premises and would credit lessee with rents collected thereafter); *Babsdon Co. v. Thrifty Parking Co.*, 149 So. 2d 566 (Fla. 3d DCA 1963) (following lessee's default, lessor explicitly and unequivocally declared its intention to relet the premises for the account of lessee).

In *Hyman v. Cohen*, 73 So. 2d 393 (Fla. 1954), the Florida Supreme Court found that a lessor elected to treat a lease as terminated and used the premises for its own purposes, even though it subsequently relet the premises.  Upon receiving the lessor's threat of eviction for non-payment of rent, the lessee vacated the premises.  *Id.* at 396.  The lessor subsequently relet the premises, but at no time advised the lessee that it was doing so "for the account of the lessee." *Id.*  The Supreme Court concluded that the lessor resumed possession for its own account and therefore had no right to recover further rental.  *Id.* at 396-97.

Similarly, here, by the time Beach attempted to relet the leased property, it had already terminated the lease agreement with Cingular.  *See In re Jet 1 Center, Inc.*, 335 B.R. 771 (M.D. Fla. 2005) (leases were effectively terminated upon debtor/lessee's failure to cure default within time fixed in lessor's notice and unconditionally terminated by the date of lessor's letter notifying debtor/lessee of termination of lease; terminated leases therefore were not property of debtor/lessee's estate); *Churchill Dev., Inc. v. Prime Outdoor Group, L.L.C.*, 816 So. 2d 764, 766 (Fla. 2d DCA 2002) (lessor's termination of lease was effective upon executing letter

advising lessee of termination).  Beach's efforts to relet the leased property therefore were not made for Cingular's account.  Consequently, Beach's termination of the lease precludes recovery of any future rents not already accrued at the time of termination.  *Hulley v. Cape Kennedy Leasing Corp.*, 376 So. 2d 884, 885 (Fla. 5th DCA 1979) (possession by lessor for its exclusive use with intent to terminate the lease precludes recovery of rents accruing after lessor's resumption of possession).

C.     Even If Beach Retook the Leased Property For the Account of Cingular, It Cannot Recover Rents Beyond the Current Lease Term.

The lease agreement provides that the lease shall automatically be extended for another five-year period "unless TENANT gives LANDLORD written notice of its intention not to exercise any such extension option at least six (6) months prior to the end of the then current term."  *Ex. One, Art. 3.*    The current lease term expires on June 15, 2008.   On February 12, 2007 out of an abundance of caution and even though there was no dispute that Cingular accepted that Beach had terminated in lease agreement, Cingular sent a letter to Beach advising that Cingular had no intention of exercising the option to extend the term of the lease agreement. *Ex. Seven*; *Colley Dep.* 52:15-24.  Because Cingular provided this written notice of non-renewal more than six months prior to the end of the lease term, there can be no basis at all for determining that Beach is entitled to recovery of rent for any of the additional lease terms, especially those that extend beyond 2017, when Beach's own right to occupy the site would end. *City of Winter Haven v. Ridge Air, Inc.*, 458 So. 2d 434, 436 (Fla. 2d DCA1984) (when the terms of a lease are clear and unambiguous, "the court cannot give it any meaning beyond that expressed").  Thus, even if Beach did retake possession of the leased property for the account of Cingular (which it did not), Beach would only entitled to recover the difference between the remainder of rent Cingular was to pay under the lease agreement (i.e. $60,000) and what, in good

faith, Beach has been able to recover from a reletting of the leased property.  *See 4-Way, Inc. v. Bryan*, 581 So. 2d 208, 209 (Fla. 1st DCA 1991).  Consequently, even if Beach had retaken possession for Cingular's account, Beach's maximum claim was $60,000.

## II.    Count IV – Waste

Waste is defined as the "destruction or material alteration of any part of a tenement by a tenant for life or years to the injury of the person entitled to the inheritance, as an unlawful act or omission of duty on the part of the tenant which results in permanent injury to the inheritance and as any spoil or destruction done or permitted with respect to lands, houses, gardens, trees, or other corporeal hereditaments by the tenant thereof, to the prejudice of him in reversion or remainder, or, in other words, to the lasting injury of the inheritance."  *Stephenson v. National Bank of Winter Haven*, 109 So. 424, 425 (Fla. 1926) (emphasis added); *see also Halifax Drainage Dist. of Volusia County v. Gleaton*, 188 So. 374, 379 (Fla. 1939) ("waste is an abuse or destructive use of the property by one in rightful possession").

There appear to be two aspects to the "waste" claim asserted by Beach.  The first relates to the extra antennas; the second to the addition to the elevated platform.   Beach alleges that Cingular improperly modified its installations by adding three more antennas without Beach's authorization and committed waste by "expanding its Equipment Shelter in a manner that exceeded the approved areas both within and outside the Site, including, without limitation, placement of support column(s) outside the boundaries of the Premises."  *First Am. Compl.* ¶ 44.

Even assuming Cingular did install more antennas on the tower without Beach's permission, no waste has occurred because all of Cingular's antennas have been now removed from the tower.  *Colley Dep.* 43:2-3.  As such, Beach cannot have suffered any injury, permanent nor otherwise, as a result of Cingular's installation of the extra antennas and Beach's president

openly acknowledged in his deposition that no damage was caused to the tower by the installation of the three additional antennas. *Colley Dep.* 57:2-5.

Turning to the construction of the expansion to the 2004 elevated platform, even if waste did occur, it is clear that Beach cannot prove it has suffered damages as a result. Florida law holds, "[i]n an action for waste, the measure of damages that may be awarded is the difference in the value of the property just before and since the tort was committed." *European American Bank v. Dupont Bldg. Associates*, 567 So. 2d 971, 972 (Fla. 3d DCA 1990). Beach has not alleged, nor can it prove, that there is any difference in the value of its leased property resulting from the continued presence of addition to the elevated platform or the continued presence of the empty equipment shelter.

Likewise, to the extent that perhaps Beach is really requesting damages for the cost of removal of the equipment shed installed in 2003 and the elevated platform constructed in 2004, then Beach still cannot prove its damages. Beach has taken no steps to remove the equipment shelter and has declined to provide any information concerning its estimate of the cost of removal of either the elevated platform or the equipment shelter. Cingular posed the following interrogatory to Beach:

> "Have you sought or obtained any proposals or quotations for the removal of any of Cingular's equipment which you allege remained on the Site after December 11, 2005."

Beach objected to the extent that the interrogatory called for disclosure of attorney client and work product privileged information, and then stated "the answer is no with regard to non-privileged communications"[17]   Nor could Mr. Colley give any information on this issue. *Colley Dep.* 47:18-24. No expert report on this issue has been tendered by Beach. Beach has not

---

[17] Answer to Interrogatory No. 9. A copy of this Interrogatory Answer is Exhibit Thirteen in the Appendix.

updated its interrogatory answers or otherwise supplemented its document production responses in this respect.

Beyond question, it would have been destructive to the other tower users' shelters to remove the Cingular equipment shelter installed in 2003, so the decision was made to leave it. *Henderson Dep. 17:1-7.* This shelter is encapsulated by the framework of the elevated platform that houses Beach TV's own equipment shed. *Harris Dep. 83:9-17.* Cingular's shed could not be moved because of the presence of Beach's shed above it. *Henderson Dep. 17: 14-17.* Moreover the Cingular shelter could not have been moved out sideways because of the adjacent equipment of another user, LA Unwired. *Henderson Dep. 17:8-13.* (" . .. it would be very difficult to remove the shelter without disrupting who was above us and who was next to us.") *Henderson Dep. 52:3-5.* ("As I understand it, the shelter could not be removed because of because of the elevated platform that was built for Beach TV's equipment") *Swinney Dep. 29:21-23.*[18]

Beach has unequivocally and affirmatively informed Cingular that the remaining equipment would be treated as Beach's own. Otherwise, possibly Beach may have been entitled to seek to recover the cost of the removal of the abandoned structures. *Bisque Associates of Florida, Inc. v. Towers of Quayside No. 2 Condominium Ass'n, Inc.*, 639 So. 2d 997, 999 (Fla. 3d DCA 1994) ("Under general principles of tort law, where the injury to real property is merely temporary, or where the property can be restored to its original condition at reasonable expense, the measure of damages should include the cost of repairs or restoration."). However, Beach's claimed damages for removal of the remaining structures cannot be hypothetical; those damages must be based on evidence justifying the award of a definite amount, which cannot be predicated

---

[18] A copy of the deposition of Jennifer Swinney is Exhibit Eleven in the Appendix.

upon pure speculation. *Eshkenazi v. Las Fabricas, Inc.*, 360 So. 2d 430, 432 (Fla. 3d DCA), *cert denied*, 366 So. 2d 882 (Fla. 1978); *see also Samuels v. Magnum Realty Corp.*, 431 So. 2d 241, 242 (Fla. 1st DCA 1983) (without any supporting particulars, corporate president's affidavit estimating damages to be "approximately" $3,000 was insufficient to prove damages); *George Hunt, Inc. v. Dorsey Young Const., Inc.*, 385 So. 2d 732, 733 (Fla. 4th DCA 1980) ("evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty"); *United Steel & Strip Corp. v. Monex Corp.*, 310 So. 2d 339, 342 (Fla. 3d DCA 1975) ("it is incumbent upon a plaintiff in a trial court to present evidence to justify an award of damages in definite amount."); *Tolin Mfg. Corp. v. Roy Feiner Handbags, Inc.*, 173 So. 2d 714, 715 (Fla. 3d DCA 1965) (evidence of damages consisting "entirely of approximations and estimates" insufficient to prove damages), Travelers *Indem. Co. v. Peacock Const. Co.*, 423 F.2d 1153, 1157 (5th Cir. 1970) ("before damages may be awarded there must be evidence authorizing or justifying the award of a definite amount, which cannot be predicated upon pure speculation"), *Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948 (11th Cir. 1984) ("the amount of damages must be capable of proof to a reasonable certainty and not left to speculation or conjecture").

In the instant case, as already explained, throughout discovery Beach has failed to produce any evidence of the cost of removal of the remaining structures, speculative or otherwise.  As already discussed, on December 6, 2006, Beach advised Cingular by letter that Beach regarded the remaining equipment "as abandoned" and that Beach would "dispose of it as (Beach), in its sole discretion, deems fit." *Ex. Five*.  Since the date of that letter, however, Beach has not removed either the equipment shelter or the elevated platform.  In discovery Beach has declined and/or been unable to provide any information concerning its estimate of the cost of

removal of either the elevated platform or the equipment shelter.  Beach also has not provided

any corporate representative testimony or expert opinion as to the cost of removal.  *See Reliance*

*Ins. Co. v. Pro-Tech Conditioning & Heating*, 866 So. 2d 700, 701 (Fla. 5th DCA 2003)

(damages to corporate property can be established by testimony of owner, expert, or qualified

corporate representative).  Accordingly, there is absolutely no evidence in the record establishing

the cost of removal of the equipment shelter and elevated platform.

Because Beach has not incurred any expense for removal of the remaining structures and

has not produced any evidence of an estimate of removal costs, Beach cannot recover damages

for removal of the equipment shelter and elevated platform.

### III.    Counts I and II
(Eviction and Unlawful Detainer)

Finally, summary judgment must be granted in Cingular's favor with respect to Beach's

eviction and unlawful detainer claims because Cingular is not in possession of the leased

property.

A.    Beach Cannot Establish a Prima Facie Case For Eviction.

Under Florida law, an action for eviction must be brought pursuant to Section 83.20,

Florida Statutes.  *Executive Square Office Bldg. v. O'Connor and Associates, Inc.*, 19 B.R. 143,

147 (M.D. Fla. 1981) ("Absent voluntary abandonment or relinquishment of the premises by the

tenant at sufferance, the lessor must resort to the statutorily prescribed judicial eviction

proceedings for a judgment of possession.").  Section 83.20 permits a landlord to institute an

action for eviction when a tenant holds over and continues possession of the premises (1) after

the expiration of the tenant's lease, (2) after any default in the payment of rent, or (3) after failing

to cure a material breach of the lease.  Fla. Stat. § 83.20(1)-(3).

Beach cannot establish even a prima facie case for eviction because Cingular is not in possession.  The First Amended Complaint alleges that Cingular has maintained possession of the leased property.  *First Am. Compl.* ¶ 28.  Contrary to this allegation, however, Beach's president testified that Cingular is not in possession of the leased property and no use currently is being made of the property.  *Colley Dep.* 54:17-21, 43:14-18.   Cingular makes no claim of entitlement to any right to possession of the tower site.    Accordingly, Beach has no cause of action against Cingular for eviction, as a matter of law.

Cingular suspects that Beach has misunderstood the scope of relief available to a landlord in an eviction action.  In its prayer for relief, Beach demands that the Court enter judgment for possession and "for removal of the Equipment Shelter as modified  . . . and the restoration of the site . . ."   As explained below, this demand significantly exceeds the relief that is available to a landlord in an eviction action.   The relief to which a landlord is entitled in an eviction action is a judgment of possession which is enforced through the issuance of a writ of possession.[19]   "If the issues are found for plaintiff, judgment shall be entered for possession of the premises."  Fla. Stat. 83.231.   "After entry of the judgment in favor of plaintiff, the clerk shall issue a writ to the sheriff describing the premises and commanding the sheriff to put plaintiff in possession."   Fla. Stat. 83.241.

Proceedings for eviction and unlawful detainer are legal in nature, rather than equitable.  *Baldwin Sod Farms, Inc. v. Corrigan*, 746 So. 2d 1198, 1204 (Fla. 4th DCA 1999); *Tollius v. Dutch Inns of America, Inc.*, 218 So. 2d 504, 505 (Fla. 3d DCA 1969).   Consequently, Beach's demand in its prayer for equitable relief namely that Cingular be ordered to remove the equipment shelter and elevated platform is tantamount to a demand for the imposition of a

---

[19]   The form of the Writ of Possession is proscribed in Form 1.915 in Forms for Use with Rules of Civil Procedure.

mandatory injunction and is improper.   A mandatory injunction is an equitable remedy, unlike the legal remedies for eviction and unlawful detainer.  *Mayor's Jewelers, Inc. v. State of Cal. Public Employees' Retirement Sys.*, 685 So. 2d 904, 908 (Fla. 4th DCA 1996).  Beach's First Amended Complaint does not include a count seeking injunctive relief.  Consequently, Cingular cannot be compelled to remove the equipment shelter and elevated platform as relief available in Beach's eviction and unlawful detainer counts.

Moreover, even if Beach had included a count for mandatory injunction, relief could not be granted in its favor, because Beach has an adequate remedy at law.  The costs of removing the equipment shelter and elevated platform might have be recoverable as damages had Beach not claimed the property as its own and supplied proper supporting proof of those costs -- which it failed to do.  *See discussion at pp. 13-16, supra.*   Nevertheless, it is well-settled that a mandatory injunction cannot be entered where a plaintiff has as adequate remedy at law. *Digaeteno v. Perotti*, 374 So. 2d 1015, 1016 (Fla. 3d DCA 1979); *see also Weinstein v. Aisenberg*, 758 So. 2d 705, 706 (Fla. 4th DCA 2000); *Diefenderfer v. Forest Park Springs*, 599 So. 2d 1309, 1313 (Fla. 5th DCA 1992) (mandatory injunction must be refused when damages can compensate owner for loss).  With a potential adequate remedy at law, there is no basis for Beach to seek a mandatory injunction.

It is not an uncommon state of affairs for a landlord to find property of a tenant still on the premises when the tenant has departed.  Under such circumstances, Florida law grants the landlord the right to make use of *Fla. Statute 715.10 et seq.*, commonly known as the "Disposition of Personal property Landlord and Tenant Act," which establishes the procedure for the sale or disposition of the abandoned property.  See, *§715.109, Fla. Stat*.   Here, of course, Beach has absolutely no need to resort to this procedure because it is obvious that Cingular

makes no continuing claim of ownership to the equipment shelter or to the additional section of elevated platform.   Rather, Cingular has simply acceded to Beach's repeated warnings that the remaining property would be deemed abandoned.   In short, there is and there never was any legal basis for Beach to file an eviction action against Cingular.

       B.     <u>Beach Also Cannot State a Claim for Unlawful Detainer.</u>

As with its claim for eviction, Beach's claim for unlawful detainer also fails because Cingular is not in possession of the leased property.   Pursuant to Section 82.05, Florida Statutes, unlawful detainer, like eviction, is a statutory cause of action.   "It is an expeditious remedy in which the main issue is the right to immediate possession."   *Tollius v. Dutch Inns of America, Inc.*, 218 So. 2d 504, 505 (Fla. 3d DCA 1969).   "Only the right to possession is involved in an action for unlawful detainer."   *Southeastern Fidelity Ins. Co. v. Berman*, 231 So. 2d 249, 251 (Fla. 3d DCA 1970).   Therefore, Beach cannot maintain an action for unlawful detainer where the defendant is not in possession of the property at issue.   For the reasons set forth above, it is indisputable that Cingular is not in possession of the property.   Consequently, Cingular is also entitled to summary judgment with respect to the unlawful detainer count.

## CONCLUSION

Cingular is entitled to summary judgment on each of Beach's four causes of action. Cingular owes no damages for future rentals, because Beach explicitly and unequivocally terminated the lease agreement between the parties.   Moreover, even if the lease had not been terminated, Beach could not recover accelerated future rent from Cingular because the lease agreement did not provided for accelerated rentals.   Beach also cannot recover on its claim for

waste because there was no destruction or material alteration of the leased property that caused

any damage or lasting injury to the property.  Finally, Beach's claims for eviction and unlawful

detainer both fail because Cingular is no longer in possession of the leased property.


Respectfully submitted,


/s/ David Hywel Leonard
Penelope A. Dixon
Florida Bar Number 0335680
David Hywel Leonard
Florida Bar Number 0296376
CARLTON FIELDS, P.A.
Post Office Box 3239
Tampa, Florida 33601
Telephone:      (813) 223-7000
Facsimile:      (813) 229-4133
E-Mail:         pdixon@carltonfields.com
E-Mail          hleonard@carltonfields.com
Attorneys for New Cingular Wireless PCS, LLC

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on the 20th day of August, 2007, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Harry E. Barr, Esq., Chesser & Barr, P.A., 1201 Eglin Parkway, Shalimar, Florida 32579 and W. James MacNaughton, Esq., 90 Woodbridge Center Drive, Suite 610, Woodbridge, New Jersey 07095.


/s/ David Hywel Leonard
Attorney