## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**BEACH TV PROPERTIES, INC.,**

        **Plaintiff,**

**vs.**                                **CASE NO: 3:06cv241/RV/MD**

**BELLSOUTH MOBILITY, LLC**
**d/b/a CINGULAR WIRELESS, and**
**NEW CINGULAR WIRELESS, PCS, LLC**

        **Defendants.**

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## A MOTION FOR PARTIAL SUMMARY JUDGMENT

**Table of Contents**

I.    **INTRODUCTION** ................................................................................. 1

II.  **STATEMENT OF FACTS** ................................................................... 1

III. **LEGAL ARGUMENT** ......................................................................... 9

    A.   **Summary Judgment Motion Standards.** ...................................... 9

    B.   **The Cingular Platform and Cingular Shelter Belong to Defendant** ............. 10

    C.   **Defendant Has No Right to Keep Its Property On the Premises.** .................. 14

    D.   **Defendant Has Breached the Lease.** ................................................ 14

    E.   **Defendant Has No Right to Shorten the Stated Term of the Lease** .............. 16

IV.  **CONCLUSION** ................................................................................. 21

## Table of Authorities

**Cases**

*Altiere v. Atlantic National Bank West Palm Beach*, 168 So. 2d 693 (2d DCA 1964) ...... 20

*Brewer v. Northgate of Orlando, Inc.*, 143 So.2d 358, 361 (Fla.2nd DCA 1962 ........ 18, 19

*Brown v. Reynolds*, 872 So.2d 290 (Fla.. 2nd DCA 2004) ................................................. 11

*Burger King Corp. v. Barnes*, 1 F. Supp. 2d 1367 (S.D.Fla. 1998) ................................. 19

*Burger King Corporation v. Hinton,* 203 F. Supp. 2d 1357 (S.D.Fla. 2002) ................... 19

*Eder v. Yvette B. Gervey Interiors, Inc.*, 407 So. 2d 312 (Fla. 4th DCA 1981) ............... 12

*Jabour v. Toppino*, 293 So. 2d 123 (Fla. 3rd DCA 1974) ................................................. 14

*Kanter v. Safran*, 68 So. 2d 553 (1953) ..................................................................... 15, 18

*McKinnon v. First Nat. Bank Of Pensacola*, 77 Fla. 777, 82 So.748 (1919) ................... 10

*Metric Sys. Corp. v. McDonnell Douglas Corp.*, 850 F. Supp. 1568 (N.D.Fla. 1994) ....... 9

*Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So.2d 707 (Fla. 2005) ...................... 12

*Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So.2d 336 (Fla. 4th DCA 1968) ................................................................................................................................. 16

*Strader v. Sunstates Corp.*, 500 S.E.2d 752 (N.C.App.1998) ......................................... 18

*Strama v. Union Fidelity Life Ins. Co.*, 793 So.2d 1129 (Fla. 1st DCA 2001) ................... 9

*Sullivan v. American Tel. & Tel. Co.*, 230 So.2d 18, 20 (Fla.. 4th DCA 1969) ............... 10

*Taylor v. Kenco Chemical & Manufacturing Corp.*, 465 So. 2d 581 (Fla. 1st DCA 1985) .............................................................................................................................................. 13

*Williams v. Aeroland Oil Co.*, 155 Fla. 114, 20 So.2d 346 (1944) ................................. 18

*Williams v. Grin*, 314 F.3d 1270 (11th Cir. 2002) ........................................................ 10

**Treatises**

*Thompson on Real Property*, 2nd Thomas Ed. ................................................................. 11

## I.  INTRODUCTION

This memorandum of law is submitted by Plaintiff Beach TV Properties, Inc. ("Plaintiff" or "Beach TV") in support of its motion for partial summary judgment for 1) an order directing Defendants Bellsouth Mobility, LLC d/b/a Cingular Wireless, and New Cingular Wireless, PCS, LLC (jointly and severally "Defendant" or "Cingular") to remove from Plaintiff's premises at 140 Palmetto Drive, Destin, Florida (the "Premises") a metal platform erected by Defendant on the Premises (the "Cingular Platform") and a metal equipment shelter erected by Defendant on the Premises (the "Cingular Shelter"), or, in the alternative, reimburse Plaintiff for its reasonable costs and expenses for removing the Cingular Platform and Cingular Shelter; and 2) a declaration that Defendant breached a lease agreement dated as of May 15, 2003 between Plaintiff and Defendant (the "Cingular Lease"); and 3) a declaration that a letter dated February 12, 2007 from Defendant to Plaintiff purporting to exercise a right to shorten the term of the Cingular Lease is of no force or effect.  For the reasons set forth in more detail below, there are no material facts in dispute and Plaintiff is entitled to the requested relief as a matter of law.

## II.  STATEMENT OF FACTS

Plaintiff broadcasts a low power television channel in Destin, Florida known as "The Tourist Network."   The transmissions are made from a one hundred eighty foot (180') communications tower (the "Tower") installed at the Premises.  Plaintiff has placed a fence around the perimeter of the Premises (the "Fence Line").  As of May 15, 2003, Plaintiff's broadcast transmission equipment was located in a wood shed on the Premises (the "Beach TV Shed").

Over the years, Plaintiff has leased out space on the Tower and at the Premises to four different cell phone companies. Those companies installed their own antennas on the Tower and related base stations on the Premises.   The Premises is about 1,100 square feet in size and very crowded due to all of the radio and television transmission equipment placed on it.

In 2002, Plaintiff and Defendant entered into negotiations for Defendant to put its antennas on the Tower and its base stations at the Premises.  During those negotiations, the parties agreed that Defendant could install six (6) antennas on the Tower (the "Six Antennas") at a height of about one hundred twenty eight feet (128') and one (1) equipment shelter on the Premises to house the base stations for the antennas (the "Cingular Shelter").  The parties agreed that Plaintiff's engineering firm, KM Consulting, Inc. ("KM Consulting") would review all of Defendant's work at Defendant's expense.

On or about May 15, 2003, the parties executed the Cingular Lease.  The Cingular Lease had an Exhibit A which stated "Construction Drawings to be inserted upon completion."   Exhibit A was otherwise blank.  Defendant was supposed to prepare and submit to Plaintiff the "construction drawings" referred to in Exhibit A but never did.

The term of the Cingular Lease started June 15, 2003 and ended twenty-five (25) years later with rent escalations every five (5) years characterized as "extended terms." Defendant had the unilateral right to terminate the Cingular Lease prior to the start of each "extended term" escalation period by sending a timely "written notice of its intention not to exercise any such extension option."

In the summer and fall of 2003, Defendant proceeded with the installation of the Six Antennas on the Tower. The Tower was reinforced to meet the wind load requirements of the City of Destin for the addition of the Six Antennas.

KM Consulting prepare a structural report for the addition of the Six Antennas on the Tower and drawings for the reinforcement of the Tower. Defendant submitted those documents to the City of Destin which issued a building permit for the installation of the Six Antennas on the Tower. It was the opinion of KM Consulting and the City's engineer who reviewed the structural report and drawings that the addition of the Six Antennas to the reinforced Tower put the Tower at its maximum capacity to withstand the wind loads required by the City of Destin Building Code.

Defendant also installed the Cingular Shelter at the Premises. Initially, the Cingular Shelter was going to be built directly beneath the Tower. But another cell phone company objected to that placement so the parties agreed to locate the Cingular Shelter at the site then occupied by the Beach TV Shed. The parties also agreed that Defendant would build a platform and shelter over the Cingular Shelter that would house Plaintiff's broadcasting equipment (the "Beach TV Platform"). The parties agreed that Plaintiff would own the Beach TV Platform.

Defendant prepared drawings for the Cingular Shelter and Beach TV Platform.[1] These were submitted by Defendant to the City of Destin along with an application for a building permit to build the Cingular Shelter and Beach TV Platform. The building permit was granted and the construction completed in October, 2003.

In 2004, Cingular installed an additional elevated platform (the "Cingular Platform") at the Premises (the "Cingular Platform") and three (3) more antennas on the

---

[1] These were prepared by a contractor other than KM Consulting.

Tower (the "Additional Antennas").  The Cingular Platform was attached to the Beach

TV Platform and extended over an area occupied by another cell phone company.  This

additional work was done without the knowledge or approval of Plaintiff or KM

Consulting.  KM Consulting did not review or approve the plans for the Cingular

Platform or the Additional Antennas.

When Plaintiff learned that this work had been done, it advised Defendant that the

work was not permitted pursuant to the Cingular Lease.  Plaintiff further advised

Defendant that the Cingular Lease would have to be amended and additional rent charged.

Defendant agreed with this request.

Defendant signed and delivered to Plaintiff a proposed amendment to the

Cingular Lease (the "Proposed Amendment").  The Proposed Amendment stated that

"Section 6, and the associated Exhibit A of the [Cingular Lease] i*s hereby modified* to so

that the Tenant will be granted the right to make certain replacements, repairs and

additions to the existing facility and equipment as described in the [Cingular Lease]."

[Emphasis added]. The Proposed Amendment listed those "specific replacements, repairs

and additions" as the Additional Antennas and the Cingular Platform. The Proposed

Lease increased the annual rent by $6,000 per year.  Defendant delivered a check to

Plaintiff for $3,500 to cover part of the rent under the Proposed Amendment.  Plaintiff

never signed the Proposed Amendment and never cashed the check.

Plaintiff sent KM Consulting to inspect the Cingular Platform and Additional

Antennas.  KM Consulting reported that the Additional Antennas were overloading the

Tower thus putting it in violation of the City of Destin Building Code.  KM Consulting

also reported that one of the footings for the Cingular Shelter was outside the Fence Line.

The parties subsequently met at the Premises to discuss the situation.  Defendant's representatives acknowledged that one of the footings for the Cingular Platform was outside the Fence Line.  They also admitted that Cingular was ignorant of the designation of the Tower by the City of Destin as an "essential facility" for purposes of calculating wind loads.  Defendant's representatives said they would "try to find a way to appease and correct the situation to see if it would work."

Instead, Defendant decided -- within thirty (30) days of the meeting -- to remove all of its antennas from the Tower and all of its equipment from the Premises because the cost of fixing the problems created by the Cingular Platform and Additional Antennas was over $150,000.  Defendant never communicated this decision to Plaintiff.

Several months went by with no action by Defendant to cure the defects in its work.  Accordingly, Plaintiff sent Defendant a letter declaring Defendant in breach of the Cingular Lease and offering Cingular the opportunity to cure the breach as provided in the Cingular Lease.

On or about September 8, 2005 -- after the expiration of the cure period -- Plaintiff sent another letter to Defendant.  That letter said:

> Please be advised that the [Cingular Lease] has been terminated as of August 23, 2005 due to Cingular's failure to cure its breaches of the [Cingular Lease] as described in my letter to you dated May 23, 2005.
>
> Pursuant to paragraph 24 of the [Cingular Lease], Cingular now has until November 23, 2005 to remove its equipment from the site.  Cingular is also obligated to pay the prevailing rent on a pro rata basis until the removal is complete.  Please advise me on when Beach TV can expect the Cingular equipment to be removed.
>
> Please be further advised that if and to the extent Cingular's equipment is not removed by November 23, 2005, Beach TV will, at its election and in its sole discretion, either consider the equipment abandoned or remove the equipment at Cingular's expense.

This letter is sent without prejudice to Beach TV's rights arising out of Cingular's breach of the Tower Lease Agreement, which are hereby reserved.

In or about November, 2005, Cingular removed the Six Antennas and the Additional Antennas from the Tower and related base stations from the Premises. Cingular did not communicate this fact to Plaintiff.  Plaintiff had no way of knowing the antennas had been removed from the Tower without hiring an expert to inspect it. Plaintiff had no way of knowing that the base stations inside the Cingular Shelter had been removed because Plaintiff did not have access to the inside of the Cingular Shelter.

At about the same time, Defendant decided it would not remove the Cingular Shelter or the Cingular Platform.  Instead, Defendant claims it decided to give the Cingular Shelter and the Cingular Platform to Plaintiff.  However, Defendant never communicated this intention to Plaintiff.

Thus, as of December 6, 2005, the Cingular Platform and the Cingular Shelter remained in place.   Plaintiff therefore believed that all of Defendant's antennas still remained on the Tower.  Plaintiff was concerned that the overloaded Tower posed a safety risk to the community.  Accordingly, Plaintiff sent Defendant a letter dated December 6, 2005 which stated:

> You have breached the [Cingular Lease] for the reasons set forth in my letter to you dated May 23, 2005.  The [Cingular Lease] was duly terminated on August 23, 2005 due to your failure to timely cure the breach.  You have failed to timely remove your equipment from the site (the "Equipment") notwithstanding Beach TV's demand for removal by my letter to you dated September 8, 2005.
>
> Please be advised that on Monday, December 12, 2005, Beach TV will begin to disconnect and remove the Equipment at Cingular's expense. The first step in this process will be disconnect the electricity which will, of course, make the Equipment useless for delivering cellular phone service.

You are being sent this notice as a courtesy so that you can make alternative arrangements for the receipt and delivery of signals being processed by the Equipment. Please contact me by no later than close of business on Friday, December 16, 2005 if you wish to recover possession of the Equipment. Otherwise, Beach TV will regard the Equipment as abandoned and dispose of it as Beach TV, in its sole discretion, deems fit.

This letter is sent without prejudice to Beach TV's rights arising out of Cingular's breach of the Tower Lease Agreement, which are hereby reserved.

In response, Plaintiff received a cryptic email from one of Defendant's

representatives which said:

We found a new site (a rooftop) to replace this site.  The construction was complete at the new site at the end of November.  I believe out [sic] cut-out to have equipment removed from the Beach TV tower was Nov 23rd, which we missed by just a few days.  The equipment should be off the Beach TV tower though.  I will check with construction to verify.

Jennifer Swinney, the author of this email testified as follows:

Q. And you go on to say, "The equipment should be off the Beach TV tower though. I will check with construction to verify."  Now, at that point in time were you uncertain as to what had been removed from the premises?

A. Right, because I was not handling the construction.  I was just following up for them.

    ***

Q. Okay. So the implication is that there may be equipment that remains on site to be removed. Fair implication?
    ***
A.  Okay. Yes.

Not knowing what, if anything, had been removed from the Tower or

Premises, Plaintiff decided to give Defendant one more opportunity to remove its

antennas and other equipment.  By the same token, Plaintiff did not want to grant

Defendant any further extensions on its rights of possession at the Premises or on the

Tower.  Accordingly, Plaintiff's attorney sent Defendant a letter on December 7 that

-7-

said:

> I have received today copies of emails that suggest you intend to remove certain equipment from the site (the "Premises") you formerly occupied pursuant to a now terminated Tower Lease Agreement between Beach TV and Bell South Mobility, L.L.C. d/b/a Cingular Wireless ("Cingular") dated May 15, 2003. Please be advised that Cingular's right to enter the Premises for any reason, including without limitation the removal of any equipment located at the Premises, terminated on November 23, 2005. You are directed to contact me before making any attempt to enter the Premises for any purpose. Any Cingular representative who enters the Premises without the prior written consent of either me or my client will be arrested for trespass.
>
> Your prompt attention to this matter would be appreciated. This letter is sent without prejudice to Beach TV's rights arising out of Cingular's breach of the Tower Lease Agreement, which are hereby reserved.

Cingular understood after receiving this letter that it could obtain access to the Premises upon request. However, Cingular did not, at any time on or after December 7, 2005, contact Plaintiff or Plaintiff's representatives to obtain access to the Premises.

This action ensued with Plaintiff filing a complaint in state court on March 14, 2006. It was subsequently removed to this court. On February 12, 2007, while the parties were engaged in discovery, Defendant sent a letter to Plaintiff which purported to exercise Defendant's right to not extend the term of the Cingular Lease.

The Cingular Shelter and Cingular Platform remain at the Premises. They are not used by Plaintiff nor does Plaintiff claim any ownership of them. Plaintiff has tried, unsuccessfully, to relet Defendant's space on the Tower and at the Premises for Defendant's account.

### III.  LEGAL ARGUMENT

**A.  Summary Judgment Motion Standards.**

The standard for granting a summary judgment motion is set forth in *Metric Sys. Corp. v. McDonnell Douglas Corp.*, 850 F. Supp. 1568, 1577 (N.D.Fla. 1994):

> A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . An issue of fact is material if it might affect the outcome of the case under the governing law. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. . .  On a summary judgment motion, the record and all inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Furthermore, the court must consider the entire record in the case, and not just those pieces of evidence which have been singled out for attention by the parties. [internal quotations and citations omitted]

The resolution of this case will require the interpretation of an ambiguous commercial lease.  The rules for construing a contract also apply to a commercial lease. *Jenkins v. Eckerd Corp.*, 913 So.2d 43 (Fla. 1st DCA 2005).  Whether a contract is ambiguous is a question of law that can be decided on a summary judgment motion.  If the relevant facts interpreting the contract are not in dispute, then the court may resolve the ambiguity as a matter of law.  As the court observed in *Strama v. Union Fidelity Life Ins. Co.*, 793 So.2d 1129, 1132 (Fla. 1st DCA 2001):

> [W]hen the terms of the contract are ambiguous, susceptible to different interpretations, parol evidence is admissible to explain, clarify or elucidate the ambiguous term. The initial determination of whether the contract term is ambiguous is a question of law for the court, and, if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law. [internal quotations and citations omitted].

The resolution of this case will also require findings regarding the parties' intent. A party's intent is a fact question.  If the facts regarding that intent are not in dispute,

then the court make the legal conclusions based on the undisputed intent.  As the

Eleventh Circuit held in *Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir. 2002):

> In general, the existence of knowledge or intent is a question of fact for the
> factfinder, to be determined after trial.  Nonetheless, summary judgment is
> proper, despite the question of knowledge or intent, if the party opposing
> summary judgment fails to indicate that he can produce the requisite
> quantum of evidence to enable him to reach the jury with his claim. There
> are many instances in the law where the evidence of state of mind is so
> unequivocal that summary judgment is proper and, indeed, expressly
> mandated by Rule 56. [Internal quotations and citations omitted]

**B.  The Cingular Platform and Cingular Shelter Belong to Defendant**

Cingular claims the Cingular Platform and Cingular Shelter belong to Beach TV

on several different theories.  All of those theories are based on the letters Plaintiff sent to

Defendant dated September 8, 2005, December 6, 2005 and December 7, 2005.

Defendant's claims have no merit for the simple reason that Plaintiff cannot unilaterally

divest Defendant of its ownership of the Cingular Platform and Cingular Shelter.  Only

Defendant can divest itself of that ownership and it has not done so under the law and

undisputed facts of this case.

Defendant states – unequivocally – that it intended to give the Cingular Platform

and Cingular Shelter to Plaintiff.  A gift transfers ownership of the property only if the

donee accepts the gift.  *McKinnon v. First Nat. Bank Of Pensacola*, 77 Fla. 777, 780, 82

So.748 (1919) ("[I]t must appear not only that the depositor intended a gift, but also that

he executed his intention, and there must be an acceptance of the gift by the donee.");

*Sullivan v. American Tel. & Tel. Co.*, 230 So.2d 18, 20 (Fla.. 4th DCA 1969) ("The

essential elements of a gift intervivos are (1) present donative intent, (2) delivery, and (3)

acceptance by the donee.")  Defendant admits that it never communicated its intention to

Plaintiff that it was giving the Cingular Platform and Cingular Platform to Plaintiff.  Thus

Plaintiff had no idea the facilities left behind by Defendant were a gift.  Nothing Plaintiff has said or done could remotely be construed as accepting Defendant's "secret" gift. Thus Defendant did not make a gift of this property to Plaintiff as a matter of law and still retains title to it.

Nor did Cingular abandon the Cingular Platform or Cingular Shelter to Plaintiff.[2] Abandoned property is defined in Florida law as "that to which the owner has voluntarily relinquished all right, title, claim and possession, with the intention of terminating his ownership, *but without vesting ownership in any other person*." *Brown v. Reynolds*, 872 So.2d 290 (Fla.. 2nd DCA 2004) (emphasis added).[3]  Cingular unequivocally states that its intent was to give its property to Plaintiff.  That intent does not support an abandonment, which requires an intention that *no one* acquires title in the property.

Defendant claims that Plaintiff waived its rights to require Defendant to remove the Cingular Platform and Cingular Shelter pursuant to its letter dated September 8, 2005.[4]  Waiver is "the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right." *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So.2d 707, 711 (Fla. 2005).  Plaintiff's September 8, 2005 letter states:

> Please be further advised that if and to the extent Cingular's equipment is not removed by November 23, 2005, Beach TV will, at its election and in its sole discretion, either consider the equipment abandoned *or remove the equipment at Cingular's expense.* This letter is sent without prejudice to Beach TV's rights arising out of Cingular's breach of the Tower Lease Agreement, which

---

[2] Plaintiff did not own the Cingular Shelter or Cingular Platform and was not Defendant's agent. It is self evident that Plaintiff could not unilaterally make Defendant abandon its property.

[3] See also *Thompson on Real Property*, 2nd Thomas Ed. §91.07 ("Abandonment is the final relinquishment of a right; the giving up of something to which one is entitled, but *without vesting the ownership thereof in any person*." [emphasis added]).

[4] See Defendant's Second Affirmative Defense.

are hereby reserved. [emphasis added]

Plaintiff expressly told Defendant that Plaintiff, in its sole discretion, would remove the equipment at Cingular's expense.  That is precisely the relief Plaintiff now seeks.  No rights were waived or relinquished.

Defendant also claims waiver in its Fifth Affirmative Defense pursuant to the letter dated December 6, 2005.  In that letter Plaintiff said it would regard the equipment "as abandoned and dispose of it as Beach TV, in its sole discretion, deems fit" if Defendant did not contact Plaintiff by December 16, 2005.  Defendant did in fact contact Plaintiff on December 7, 2005 by an email that indicated Defendant might be removing equipment from the Premises. Plaintiff told Defendant to get permission in writing before entering the Premises to remove its equipment.  At all times, Plaintiff reserved the right to dispose of the equipment in its sole discretion, including removing it at Defendant's expense.  Nothing in the December 6 or subsequent December 7 letter could be construed as a relinquishment of the right to refuse to accept title to Defendant's equipment.

Moreover, Plaintiff expressly said in all of this correspondence that its demands and stated intentions were "without prejudice to Beach TV's rights arising out of Cingular's breach of the [Cingular Lease], which are hereby reserved."  This express reservation of rights means none of these letters waived those rights – including the right to make Defendant remove its property from the Premises.  *Eder v. Yvette B. Gervey Interiors, Inc.*, 407 So. 2d 312, 313 (Fla. 4th DCA 1981)  ("A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest' or the like are sufficient.").

Defendant claims in its Third Affirmative Defense that "Plaintiff is estopped to demand any damages or any other relief from Cingular relating to any equipment which might have remained on the property because Plaintiff advised Cingular that such property would be deemed abandoned or would be removed at Cingular's expense. Plaintiff has not asserted that it has incurred any expense in removing any such the equipment." The elements of estoppel, as set forth in *Taylor v. Kenco Chemical & Manufacturing Corp.*, 465 So. 2d 581, 586-87 (Fla. 1st DCA 1985) are:

> (1) words and admissions, or conduct, acts, and acquiescence, or all combined, causing another person to believe in the existence of a certain state of things; (2) in which the person so speaking, admitting, acting, and acquiescing did so willfuly, culpably, or negligently; and (3) by which such other person is or may be induced to act so as to change his own previous position injuriously.

Defendant was certainly justified in believing Plaintiff's statement that it intended that the Cingular Platform and Cingular Shelter "would be removed at Cingular's expense" because that is what Plaintiff said and meant it. And in this action, Plaintiff seeks to make good on its statement by asking the court to order the removal of that equipment at Defendant's expense. The Third Affirmative Defense fails as a matter of law because there are no facts that show Defendant acted or was induced to act on Plaintiff's stated intent "so as to change its own position injuriously."

In its Fourth Affirmative Defense, Defendant claims

> Plaintiff has expressly forbidden Cingular from entering onto the property to remove any remaining equipment or for any other purpose. Thus, plaintiff has taken possession of the property and has expressly precluded Cingular from entering the property under threat of arrest for trespass [pursuant to a letter dated December 7, 2005].

> This Affirmative Defense has no merit because it grossly misconstrues both

the December 7 letter and Defendant's stated understanding of that letter.  The December 7 letter said "[y]ou are directed to contact me before making any attempt to enter the Premises for any purpose."  It did not say "you may not come on the Premises under any circumstances."  Defendant understood that it could have access to the Premises if so requested.  The fact that Defendant did not make that request does not magically transfer title of the Cingular Platform and Cingular Lease to Plaintiff.

**C.  Defendant Has No Right to Keep Its Property On the Premises.**

The parties agree on one thing in this case – Cingular currently has no lawful right to possess any part of the Premises.  Accordingly, Defendant's property -- the Cingular Shelter and Cingular Platform -- trespasses on the Premises. Plaintiff respectfully requests the Court to order Cingular to remove the Cingular Platform and Cingular Shelter from the Premises or to reimburse Plaintiff for the reasonable expenses of conducting the removal itself.  See *Jabour v. Toppino*, 293 So. 2d 123 (Fla. 3rd DCA 1974).

**D.  Defendant Has Breached the Lease.**

Plaintiff respectfully requests the court to find that Defendant has breached the Cingular Lease by the installation of the Cingular Platform and Additional Antennas.  Such a finding will affect the amount of damages Plaintiff can recover in this case.

The parties dispute the current status of the Cingular Lease.  Defendant contends the Cingular Lease has been terminated by the parties and that it did not breach the

Cingular Lease.   Defendant claims it therefore has no liability for any rent accruing under the Cingular Lease after its termination.[5]

Plaintiff contends that Defendant breached the Cingular Lease and that Defendant unlawfully retains possession of the Premises because the Cingular Platform and Cingular Shelter – which belong to Cingular -- have not been removed.  Plaintiff contends its measure of damages cannot be determined until after it is afforded the opportunity to retake possession of the Premises which first requires the removal of Defendant's property.

That repossession can be for Plaintiff's own account in which event its measure of damages is the difference between the rent stated in the Cingular Lease and the fair market value of the space.[6]  Or that repossession can be for Defendant's account in which event the measure of damages is the rent stated in the Cingular Lease less the amounts, if any, Plaintiff can collect from reletting the space formerly occupied by Defendant. *Kanter v. Safran*, 68 So. 2d 553, 558 (1953).  Under either scenario, the right of recovery for "lost rent" arises out of Defendant's breach of the Cingular Lease.

Under the Cingular Lease, the installation of both the Cingular Platform and the Additional Antennas required Plaintiff's approval which was never obtained.  The Cingular Lease, on its face, is ambiguous about what precisely was going to be installed on the Tower and at the Premises because Exhibit A "Construction drawings to be inserted upon completion" was never provided by Cingular.  The court therefore looks to all the extrinsic evidence to determine what the parties' intended to install on the Tower

---

[5] Defendant has not counterclaimed against Plaintiff for breach of the Cingular Lease.

[6] The four other cell phone companies in Destin are already on the Tower.  It is highly unlikely anyone else will want to occupy the space formerly occupied by Defendant.

and at the Premises pursuant to the Cingular Lease.  *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So.2d 336, 337-38 (Fla. 4th DCA 1968):

> It is a cardinal rule that the construction of all written instruments is a question of law to be determined by the court where the language used is clear, plain, certain, undisputed, unambiguous, unequivocal, and not subject to conflicting inferences. . . .

> In the construction of contracts the intention of the parties is to govern. Such intention is ordinarily deduced from the language employed when the same is without ambiguity; however, if the language used does create an ambiguity, then parol evidence is properly admissible, not for the purpose of changing or varying the terms of the written  instrument, but to elucidate, explain or clarify the intention of the parties.

All of the evidence shows that under the Cingular Lease, the parties intended to put six antennas on the Tower and one (1) 8' x 12' Cingular Shelter on the Premises to house the base stations for those six antennas.   The most compelling evidence of this is the Proposed Amendment in which Defendant explicitly admits that the Additional Antennas and the Cingular Platform were <u>not</u> part of Exhibit A to the Cingular Lease. *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So.2d  at 339 ("Admissions that do not contradict or vary the written terms of the agreement, but rather explains the intention of the parties the wording are admissible.")  The undisputed facts show the parties intended that the installation of the Additional Antennas and the Cingular Platform required Plaintiff's consent which was never given.  Defendant thus breached the Cingular Lease with that installation.

**E.  Defendant Has Lost the Right to Shorten the Term of the Cingular Lease.**

Plaintiff's claim for money damages began to accrue on the date Defendant breached the Cingular Lease. At that point in time, Defendant was obligated to pay rent

through June 15, 2028.  Defendant also had the unilateral right to shorten the term of the

Cingular Lease once every five (5) years.

The Cingular Lease provided in Article 3 that:

TENANT shall have the option to extend the term of this Agreement for
four (4) additional consecutive five (5) year periods. Each option for an
extended term shall be deemed automatically exercised without notice by
TENANT to LANDLORD unless TENANT gives LANDLORD written
notice of its intention not to exercise any such extension option at least six
(6) months prior to the end of the then current term.

On February 12, 2007, Defendant sent Plaintiff a letter that purported to exercise

Defendant's right to shorten the term of the Cingular Lease (the "Non-Renewal

Notice").[7]  Specifically, Defendant said:

As you are aware, in 2005, Beach TV Properties, Inc. notified [Cingular that
the Cingular Lease] was being terminated as of August 23, 2005 and
demanded that Cingular remove its equipment from the site.  Based upon
that termination, Cingular proceeded to remove all of its antennas and
related equipment from the Destin tower.  Cingular does not dispute the fact
that [the Cingular Lease] has been terminated; although Cingular does not
agree that there was any default on Cingular's part under [the Cingular
Lease.]  Given that state of affairs, the sole purpose of this letter is to advise
Beach TV Properties, Inc., out of an abundance of caution, that Cingular has
no intention of exercising any extension option as referenced in Article 3 of
[the Cingular Lease].

If this letter has any legal effect -- i.e. if it reduces the final expiration date of the

Cingular Lease from June 15, 2028 to June 15, 2008 -- then it will significantly reduce

the amount of damages or lost rent Plaintiff can recover for Defendant's breach of the

Cingular Lease.  Plaintiff respectfully asks this court to find that the Non-Renewal Notice

has no such legal effect.

Plaintiff has two alternative legal theories for recovering money damages for

Defendant's breach of the Cingular Lease.  There is a different measure of damages for

---

[7] The Non-Renewal Notice, on its face, shows Defendant had not agreed to the surrender of the Cingular
Lease.

each theory. However, under both theories, Defendant's Non-Renewal Notice cannot, as a matter of law, unilaterally shorten the term of the Cingular Lease to Defendant's benefit.

Cingular can be relieved of its lease obligation to pay rent if the Cingular Lease has been surrendered. Surrender can be express or implied and effects a total termination of the lease. Upon surrender, the lease no longer exists and the lease obligation to pay rent expires. *Williams v. Aeroland Oil Co.*, 155 Fla. 114, 118, 20 So.2d 346 (1944).

But even if the Cingular Lease has been completely terminated by surrender, Plaintiff still retains the right to recover damages for the anticipatory breach of contract as recognized in *Kanter,* 68 So.2d at 558. Plaintiff has a cause of action for breach of contract and Defendant has whatever defenses it can muster to a breach of contract action. But those defenses do not include the exercise of rights under a wholly terminated lease. *Brewer v. Northgate of Orlando, Inc.*, 143 So.2d 358, 361 (Fla.2[nd] DCA 1962):

> Where, upon a material breach by one party, the other party treats the breach as total by refusing to perform further and by maintaining an action for damages for such total breach, he is said to abandon further performance, but such abandonment is not technically a rescission of a contract, but a mere acceptance of a situation created by the wrongdoing of the adverse party. *Such abandonment terminates or discharges the contract for purposes of further performance*, but keeps it alive for the purposes of supporting an action and measuring the recovery. [emphasis added]

See also *Strader v. Sunstates Corp.*, 500 S.E.2d 752 (N.C.App.1998):

> A lease is a contract which contains both property rights and contractual rights. Property rights include the right to receive unpaid rents and the reversionary right in the leasehold. Contract rights include the right to sue for breach of express and implied covenants and the right to sue for consequential damages stemming from a breach of a lease. Once a lease has been terminated, all property rights are extinguished; any contractual rights, however, remain intact. [citations omitted].

Nor does the fact that Defendant sought to limit the term of the Cingular Lease after it was breached have any evidentiary value affecting Plaintiff's damages. "Florida

law allows a non-breaching party . . . to choose between being placed in the position it would have been in *had the contract been fully performed* by seeking lost profits or being placed in the position it was in prior to entering the contract by seeking the reasonably foreseeable damages flowing from the breach. [emphasis added]. *Burger King Corporation v. Hinton,* 203 F. Supp. 2d 1357 (S.D.Fla. 2002); *Burger King Corp. v. Barnes*, 1 F. Supp. 2d 1367 (S.D.Fla. 1998).

Plaintiff's alternative theory for a money claim is based on a finding that the Cingular Lease has not been fully terminated by express or implied surrender.[8]  Under this theory, the landlord takes possession of the demised premises "for the account" of the tenant.  The tenant remains liable for the unpaid rent as it accrues and the measure of the monetary award is the rent stated in the lease less any amounts landlord can recover by reletting the premises.

Under either theory, the remaining term of the Cingular Lease is highly relevant to determining the total rent due under the Cingular Lease.  But under the "tenant's account" theory, the lease obligation to pay pursuant the Cingular Lease remains in tact. Thus Defendant's Non-Renewal Notice could arguably have some kind of residual legal effect if it comes within the penumbra of that obligation.   The Non-Renewal Notice appears to assert that right.

The argument has no merit for two reasons.  The first is that the Cingular Lease remains in tact so long as Plaintiff holds possession for the account of Defendant.

---

[8] There is no such express agreement by the parties to surrender the Cingular Lease in this case.  An implied agreement to surrender requires a showing that both parties acted in a manner inconsistent with the lease. *Brewer v. Northgate of Orlando, Inc.*, 143 So.2d at 360 ("A lease agreement may be rescinded by the consent of the parties by either a subsequent express agreement, or by an agreement implied from joint acts and conduct inconsistent with the pre-existent relationship.")  Defendant's continued occupancy of the Premises with the Cingular Lease and Cingular Platform after being told to leave is not consistent with its claim that it agreed to the termination of the Cingular Lease.

Whatever ancillary rights accrue from that Plaintiff also holds possession, including any unilateral rights to shorten the term of the lease.

The second reason is that a party cannot be permitted to benefit from its own misconduct.   When Defendant breached the Cingular Lease, it lost the right to limit its damages by purporting to shorten the term of the lease.  See *Altiere v. Atlantic National Bank West Palm Beach*, 168 So. 2d 693, 695 (2d DCA 1964):

> The strict rules applicable to forfeitures when claimed by lessors apply with like force to lessees who attempt to take advantage of cancellation provisions for their own benefit, and it must be shown that the contingency arose without fault on the part of the lessee. He will not be allowed, by taking advantage of his own default, to escape liability on a burdensome contract.

Defendant had ample opportunity to shorten the term of the Cingular Lease before being called to account for its breach.  It could have sent the Non-Renewal Notice before the notice of breach was sent on May 23, 2005 or even during the ensuing cure period. Defendant also had ample opportunity to cancel the Cingular Lease itself while it was still in full force and effect by simply giving ninety (90) days notice and paying one (1) years rent.  See ¶23(a) of the Cingular Lease.  But Defendant chose neither option. Instead, it decided to remove all of its antennas from the Tower and all of its base stations from the Premises without informing Plaintiff of its intention, leave everything else in place as a secret "gift" and claim its obligations under the Singular Lease have been unilaterally terminated by Plaintiff.

## IV. CONCLUSION

Defendant got itself into this predicament by doing whatever it wanted, whenever it wanted and without telling Plaintiff what it was doing or why.  Defendant's conduct was either very arrogant or very incompetent.  In reality it is probably some combination of both.   Plaintiff now asks this court to hold Defendant accountable for all of its obligations under the Cingular Lease, not just the one's Defendant has selected for its own convenience.

For the reasons set forth above, Plaintiff respectfully requests that it be granted partial summary judgment as follows:

1.      An order directing Defendant to remove the Cingular Platform and Cingular Shelter from the Premises or, in the alternative, reimburse Plaintiff for its reasonable costs and expenses for removing the Cingular Platform and Cingular Shelter; and 2)

2.      A declaration that Defendant breached the Cingular Lease; and

3.      A declaration that a letter dated February 12, 2007 from Defendant to Plaintiff purporting to exercise a right to not extend the term of the Cingular Lease is of no force or effect.

August 20, 2007

**W. James Mac Naughton, Esq.**

s/W. James Mac Naughton

90 Woodbridge Center Drive
Suite 610
Woodbridge, NJ 07095

Office – 732-634-3700
Fax – 732-634-7499
w.j.mac.naughton@att.net
Counsel for the Plaintiff.

## CERTIFICATE OF SERVICE

I CERTIFY that on the 20th day of August, 2007, I delivered a copy of this

pleading by email and electronic service to Penelope A. Dixon of Carlton Fields, P.A.

Post Office Box 3239 Tampa, Florida 33601